**WOMEN'S DEVELOPMENT CORPORATION, et al.**

v.

**CITY OF CENTRAL FALLS.**

**Nos. 98–207–Appeal, 99–87–Appeal, 99–293–Appeal.**

Supreme Court of Rhode Island.

Jan. 11, 2001.

Peter J. McGinn, Alden Harrington, Providence, for Plaintiff.

Lauren E. Jones, Marc DeSisto, Providence, J. William Harsch, Carolyn Ann Mannis, for Defendant.

Present WEISBERGER, C.J.,
LEDERBERG, BOURCIER,
FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

The materiality of various breaches of contract, the sufficiency of evidence to support a fraud counterclaim, and the propriety of certain attorney's fee awards are before us on these cross-appeals. A Superior Court trial justice disposed of the parties' various claims and counterclaims by entering judgment as a matter of law, prompting both sides on appeal to challenge various aspects of her rulings.

### Facts and Travel

The plaintiffs, Women's Development Corporation and Women's Opportunity Realty Corporation (collectively, WDC),[1] appeal from a Superior Court judgment for the defendant City of Central Falls (the city or Central Falls). The court dismissed WDC's breach-of-contract claims after it granted the city's motion for judgment as a matter of law. Each side had asserted breach-of-contract claims against the other. In its counterclaim, Central Falls also accused WDC of fraud, and the city appeals from that portion of the court's judgment that ruled as a matter of law in favor of WDC and dismissed the city's fraud claim.

This case involves a contractual dispute pertaining to the development of a Central Falls low-income housing project funded by the federal Community Development Block Grants (CDBG) program. The CDBG program used public money to develop low-income and moderate-income housing. In each year of the program's existence, the federal government appropriated money for this purpose, and then apportioned it among the fifty states according to a formula established by federal

law. *See* Housing and Community Development Act of 1974, 42 U.S.C.A. §§ 5301 through 5321 (West 1995). As required by federal law, the state accepted the CDBG money on condition of complying with a host of federal rules and regulations. *See, e.g.,* 24 C.F.R. §§ 570.480 through 570.497 (2000).

The state distributed its CDBG money to participating municipalities on a statewide basis through a competitive bidding process. In 1994 and 1995, Central Falls applied for and obtained CDBG money to support a local program known as the Centennial Urban Renewal Enterprise (CURE). One aspect of CURE involved housing rehabilitation designed to generate multiple units of affordable housing for the low-to-moderate-income rental market. WDC, a nonprofit entity formed to develop low-income housing, consulted with Central Falls about a particular CURE housing-development project (the CURE project) in the city. WDC represented that it possessed significant expertise in administering this kind of housing-development project. For each year of the two years that the state granted the city CDBG funding to proceed with the CURE project, the city entered into a separate contract with WDC. For each of these two years (1994 and 1995) the city also entered into a contract with the state. (The parties anticipated that the CURE project would require a number of years to build; thus, the state, city, and WDC understood and agreed that the city would contribute money to the CURE project over three consecutive grant years.)

Under its two contracts with the city that are at issue here (the 1994 and 1995 contracts), WDC was responsible for property acquisition, design, development, construction, financing, and overall administration of the CURE project. Both the city-WDC contracts and the city-state contracts were subject to extensive federal

---

1. The relationship between these two entities was such that, throughout the Superior Court litigation, the two corporations were referred to collectively as the Women's Development Corporation (WDC). Consistent with this protocol, we refer to them both as WDC.

regulations. Indeed, the city-WDC contracts explicitly recognized this fact. Of particular relevance to this dispute were certain contractual obligations imposed by federal law. According to its contract with the city, WDC was required to (1) include "anti-kickback" and "equal employment opportunity" (EEO) language in all its subcontracts; (2) obtain written approval from the city before subcontracting various services it was to perform under the contract; and (3) use competitive procurement procedures when subcontracting for services specified in the contract.

For services rendered under its 1994 contract, WDC submitted two requisitions to the city totaling $123,618.90. The state approved these requisitions and transmitted that money to the city, which then paid it to WDC for contractual services rendered. WDC later submitted three more requisitions—totaling $186,660.10 [2]—for services completed under both the 1994 and 1995 contracts. The state approved each of these requisitions and transmitted to the city the money required to pay WDC for this work.

In January 1996, Lee Matthews took office as the new mayor of Central Falls. Thereafter, according to WDC, the city's attitude toward the CURE project and WDC dramatically changed. As Mayor-elect, Matthews told John McAlmont, the city manager, that he intended to "dismantle" the CURE project. As the new mayor, Matthews refused to release the funds relating to the three approved WDC requisitions, and he refused to act upon a fourth requisition totaling $29,930. Although both the city and the state acknowledged they owed money to WDC for services completed under the contracts, the city failed to pay WDC for these services. Significantly, the city did not notify WDC of any alleged deficiencies in its methods of subcontracting or in its contractual documentation. Indeed, the city manager testified that, before the city notified WDC of its termination as a city contractor, WDC always had undertaken appropriate corrective action whenever he had identified any deficiencies with regard to its contractual documentation. When the city refused to pay over to WDC the money for WDC's three requisitions and when it refused to close on the sale of three properties that were to be developed as part of the CURE project (all of which had received prior approval), WDC filed a breach-of-contract suit in Providence County Superior Court in March 1996.

On April 10, 1996, the mayor sent a letter to WDC in which he stated that the city was terminating its WDC contracts "for cause." Even though the city had not previously complained to WDC about its alleged deficient performance under the contracts, the letter cited WDC's failure to provide accurate documentation to the city in connection with the CURE project as justification for terminating its contracts with WDC. The letter also stated that WDC had "failed to cooperate" with an audit of the project, had submitted "false and misleading invoices," and had made "material misrepresentations" to secure approval of various elements of the project.

Because WDC's complaint included a claim under 42 U.S.C. § 1983 (alleging violations of federal statutory and constitutional rights in addition to state law breach-of-contract claims), the city elected to remove the case to United States District Court for the District of Rhode Island. Ultimately, the city filed an amended counterclaim against WDC, alleging breach-of-contract and fraud. On June 11, 1997, the federal district court dismissed WDC's 42 U.S.C. § 1983 claim. Because no other basis for federal jurisdiction remained, the federal district court remanded the case to the Superior Court.

Before trial began in the Superior Court, WDC moved to dismiss the city's fraud counterclaim. It asserted that this claim lacked the particularity that Rule

---

**2.** The record below erroneously indicates that these three requisitions total $186,606.10.

9(b) of the Superior Court Rules of Civil Procedure required for pleading fraud claims. After the trial justice denied this motion, the parties tried the case before a Superior Court trial justice sitting with a jury. At trial, WDC's vice president testified that it had performed "one hundred percent" of the services specified in the contracts. Although the city introduced no evidence directly challenging WDC's substantial completion of these services, it did establish (through WDC's admissions) that WDC had failed to (1) include the requisite anti-kickback and EEO language in its subcontracts, (2) obtain the city's advance written approval before entering into various subcontracts, and (3) use competitive procurement procedures for all of its subcontracts. After the parties rested, the city moved (pursuant to Rule 50 of the Superior Court Rules of Civil Procedure) for judgment as a matter of law on the parties' respective breach-of-contract claims, and WDC (again, pursuant to Rule 50) moved for judgment as a matter of law against the city's fraud claim.[3] Finding that, as a matter of law, WDC's admitted noncompliance with the above-specified contractual requirements constituted material breaches of the contract, the trial justice granted the city's Rule 50 motion and awarded the city monetary relief. Specifically, the trial justice ordered WDC to reimburse the city for the $123,618.90 that the city already had paid to WDC for its services under the 1994 contract. The court also ruled that the city was not obliged to make any further payments to WDC pursuant to the state-approved but unpaid requisitions. Finally, the trial justice granted WDC's motion for judgment as a matter of law on the city's fraud claim.

Post-trial proceedings focused upon the city's attempts to execute on the judgment in its favor and upon WDC's liability for the attorney's fees incurred by the city in connection with this litigation. After entry of the order granting the motion for judgment as a matter of law on the city's breach-of-contract claims, the city moved for an award of attorney's fees under G.L. 1956 § 9–1–45 (which allows an award of attorney's fees for a party's prosecution of nonjusticiable breach-of-contract claims). The trial justice ultimately assessed attorney's fees and costs totaling $114,853.22 against WDC for the legal expenses the city had incurred in litigating the parties' breach-of-contract claims.

While litigating the § 9–1–45 attorney's fees question, the city sought and obtained an execution on the judgment. When WDC failed to satisfy the judgment, the city commenced supplementary proceedings. WDC then moved for a stay of execution, but it did so without filing a supersedeas bond under Rule 62 of the Superior Court Rules of Civil Procedure and G.L.1956 § 9–25–4. WDC claimed that, because of its parlous financial condition, it would be "impossible" for it to secure such a bond pending its appeal to this Court. The trial justice denied WDC's motion for a stay without a bond, and the city then petitioned WDC into receivership.[4] Despite its initial assertion that it would be impossible for it to procure a bond, WDC ultimately obtained a supersedeas bond on the day of the hearing to appoint a receiver. As a result, it renewed its motion for stay of execution. The trial justice approved the bond and stayed execution on the judgment. In response, the city then moved for the imposition of sanctions against WDC pursuant to Rule 11 of the Superior Court Rules of Civil Procedure and G.L.1956 § 9–29–21. Concluding that WDC had attempted to mislead the court about its supposed finan-

---

3. The parties apparently disagree—and the record does not clearly indicate—whether WDC moved for judgment as a matter of law on its breach-of-contract claims. For the reasons provided below, this procedural detail does not affect our disposition of this matter.

4. Apparently, the receivership action is still pending, though that matter is not now before us.

cial inability to obtain the bond, the trial justice agreed that sanctions were in order. As a result, she imposed attorney's fees and costs totaling $44,740.67 against WDC for its misconduct in connection with obtaining the stay of execution. Cross-appeals to this Court followed these rulings.

## Issues Presented

Five issues confront us. First, WDC argues that the contract breaches complained of by the city were immaterial and that, given its substantial performance under the contract, the trial justice erred in granting the city judgment as a matter of law on its breach-of-contract claims. Second, the city contends that the trial justice erred in granting judgment as a matter of law in favor of WDC on the city's fraud counterclaim. Third, WDC suggests that the trial justice erred in denying its motion to dismiss the fraud count pursuant to Rule 9(b). Fourth, WDC challenges the trial justice's decision to award attorney's fees to the city pursuant to § 9–1–45 for allegedly asserting nonjusticiable breach-of-contract claims, suggesting that she did not apply the correct standard under that statute. Finally, WDC criticizes the amount of attorney's fees awarded to the city pursuant to Rule 11 and § 9–29–21 in connection with obtaining a stay of execution.

## Standard of Review

In reviewing a trial justice's decision on a motion for judgment as a matter of law, this Court is bound to follow the same rules and legal standards as govern the trial justice. *See Mellor v. O'Connor*, 712 A.2d 375, 377 (R.I.1998); *Hoffman v. McLaughlin Corp.*, 675 A.2d 404, 405 (R.I. 1996). When presented with such a motion, the trial justice

"considers the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draws from the record all reasonable inferences that support the position of the nonmoving party. * * * If, after such a review, there remain factual issues upon which reasonable persons might draw different conclusions, the motion for [judgment as a matter of law] must be denied, and the issues must be submitted to the jury for determination." *DeChristofaro v. Machala*, 685 A.2d 258, 262 (R.I.1996).

Mindful of this standard, we proceed to consider the challenges raised to the trial justice's rulings on the motion for judgment as a matter of law. We then address the attorney's fee awards.

## I

## Materiality of WDC's Contractual Noncompliance and Substantial Performance

The trial justice in this case ruled that WDC had materially breached the 1994 and 1995 contracts by its failure to adhere to various contractual provisions when it performed under the contracts. The trial justice found that the evidence pertaining to the breaches was "basically * * * uncontradicted," and ruled that, "each of those breaches in and of themselves is very material. * * * Assuming for the sake of argument that none of those breaches was material, then at the very least, all of them taken together are extraordinarily material * * *."[5] For the reasons amplified below, we respectfully disagree and hold that, as a matter of law, the four breaches referred to in the trial justice's decision—whether considered individually or collectively—did not constitute a material breach of contract that

---

5. The city also points to three other grounds in support of its position that judgment as a matter of law was appropriate here. We do not address these additional grounds, and confine our remarks to the four grounds upon which the trial justice based her ruling. These and any other disputed factual issues should be resolved after the remand for a new trial.

justified either the city's termination of the contract or the trial justice's award of damages against WDC.

■ A party's material breach of contract justifies the nonbreaching party's subsequent nonperformance of its contractual obligations. *See Iannuccillo v. Material Sand and Stone Corp.*, 713 A.2d 1234, 1239 (R.I.1998); *Aiello Construction, Inc. v. Nationwide Tractor Trailer Training and Placement Corp.*, 122 R.I. 861, 863, 413 A.2d 85, 87 (1980). But whether a party has substantially performed or materially breached its contractual obligations is usually a question of fact to be decided by the jury. *National Chain Co. v. Campbell*, 487 A.2d 132, 135 (R.I.1985); *see also URI Cogeneration Partners, L.P. v. Board of Governors for Higher Education*, 915 F.Supp. 1267, 1285 (D.R.I.1996). However, if the issue of materiality admits of only one reasonable answer, then the court should intervene and resolve the matter as a question of law. *See e.g.*, Gibson v. City of Cranston, *37 F.3d 731, 736 (1st Cir. 1994).*

Determining the legal threshold for "materiality" is "necessarily imprecise and flexible." Restatement (Second) *Contracts* § 241 cmt. *a* at 237 (1981). One court has described a material breach as "a failure to perform a substantial part of the contract or one or more of its essential terms or conditions, or if there is such a breach as substantially defeats its purpose;" in other words, such a breach is one that, "upon a reasonable construction of the contract, it is shown that the parties considered the breach as vital to the existence of the contract." *UHS–Qualicare, Inc. v. Gulf Coast Community Hospital, Inc.*, 525 So.2d 746, 756 (Miss.1987).

The Restatement (Second) *Contracts* § 241 at 237 suggests that a court should weigh five circumstantial elements in determining whether a breach is material:

"(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

"(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

"(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

"(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

"(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing."

To the extent that the restatement criteria provide assistance in assessing WDC's performance in this case, they argue against the conclusion that WDC materially breached the contracts. WDC's mere failure to include anti-kickback and EEO language in its subcontracts, to obtain prior written approval from the city before subcontracting various services, and to use competitive-bidding procurement procedures was not shown to have deprived the city of any reasonably expected contractual benefits. The city also failed to establish that any of these omissions and/or failures on WDC's part could not have been cured had the city brought these matters to WDC's attention in a timely fashion.

■ Most importantly, the city failed to prove that any of WDC's omissions or failures resulted in any actual harm to the city or that they had served to frustrate the parties' expectations in any material way. For example, there was no evidence of any actual kickback violations or EEO noncompliance (or even allegations of such violations) committed by WDC or by any of its subcontractors. Furthermore, WDC established at trial that the city had failed to provide it with any notice that would have given it the opportunity to correct any alleged documentary or other defi-

ciency in the subcontracts.[6] Instead, the trial justice ruled that the mere absence of the requisite language in WDC's subcontracts was a material breach entitling the city to withhold and recoup payments for work that WDC showed it had already substantially performed. And even though WDC failed to obtain the city's written approval before subcontracting certain work specified in the contract, WDC submitted evidence establishing that the city official responsible for overseeing WDC's compliance had not required any subcontract documentation to be submitted before the end of the project, and that he had given oral approval to WDC for certain of its subcontracts, despite the absence of documentation confirming that approval. *Cf. Fleet Construction Co. v. North Smithfield,* 713 A.2d 1241, 1244 (R.I.1998) (holding that town official's waiver of contract provision was within his authority absent evidence that official lacked the actual power to do so). Finally, WDC introduced similar evidence about its admitted failure to follow competitive procurement procedures. For example, the city official responsible for supervising WDC's compliance testified that he was aware that WDC had hired an architect without WDC's having followed the procurement procedures laid out in the contract. He was also aware that the subcontract with the architect had been *approved* by the state agency in charge of CDBG programming. Thus, the evidence indicated that, to the extent WDC had not adhered to the letter of its contractual obligations with respect to its own subcontracts, the city had not "considered the breach as vital to the existence of the contract." *UHS–Qualicare, Inc.,* 525 So.2d at 756.

█ Ultimately, the city's position was that, notwithstanding the evidence of WDC's substantial performance of its contract obligations, WDC's failure to adhere to certain specific federal mandates in its subcontracts rendered the city liable to state and federal entities for the CDBG money it had paid to WDC. The city also contended that WDC's contractual failings had jeopardized the city's future participation in the CDBG program if the state or federal government ever sought to enforce these deficiencies. As a result, the city contended, it was excused from paying WDC for the work it had performed under the contracts.

After evaluating these assertions, however, we are persuaded that the city "doth protest too much."[7] On this record, the city failed to show that WDC's actions in this case placed it in any real jeopardy with any federal authorities. Although the federal regulations governing the administration of CDBG funds do provide for the possibility of potential remedial action (including, but not limited to, the suspension of future CDBG funding) for any local

---

**6.** In addition, given the overlay of statutory duties involved in this kind of contractual setting, it is doubtful that the WDC contracts even needed to be amended to include the "anti-kickback" or EEO language. Contract language that is required by applicable statutes or regulations is automatically incorporated into a contract regardless of whether the parties are aware of such a requirement or even if the written contract specifically provides otherwise. *See Citizens for Preservation of Waterman Lake v. Davis,* 420 A.2d 53, 57–58 (R.I.1980); *Sterling Engineering & Construction Co. v. Town of Burrillville Housing Authority,* 108 R.I. 723, 726, 279 A.2d 445, 447 (1971) ("It is a fundamental rule that all contracts are made subject to any law prescribing their effect or conditions to be observed in their performance. The statute is as much a part of the contract as if the statute had been actually written into the contract. This is so even though the parties knew nothing of the statute and did not include the provision or even though they knew of the legislation and expressly agreed upon the exact contrary."). *See also United States v. Bills,* 822 F.2d 373, 377 (3d Cir.1987) (applying concept in case involving federal statutory obligations, "[w]here valid regulations apply and require inclusion of a specific clause in public contracts it will be incorporated even if omitted from the writing or not approved by the parties").

**7.** William Shakespeare, *Hamlet, Prince of Denmark,* act 3, sc. 2.

government's "ineligible activity" under the program, they do so only after the municipality has been provided with notice of the alleged noncompliance and an opportunity for a hearing. *See* 24 C.F.R. §§ 570.495, 570.496. No such notice had been given to the city; nor was there any indication that it was likely to receive such a notice or undergo such a disqualification proceeding based upon any of WDC's complained-of breaches. Furthermore, the federal statute authorizing the Secretary of Housing and Urban Development to remedy a local government's noncompliance with federal mandates provides that the Secretary must find that the recipient of the money "has failed to comply substantially" with CDBG program requirements. 42 U.S.C.A. § 5311. Moreover, the Secretary may initiate remedial action only "after reasonable notice and opportunity for hearing" has been provided to the funding recipient. *Id.* The record does not indicate any objection from the federal government alleging that either the city or WDC "has failed to comply substantially" with CDBG's contractual requirements. On the contrary, each governmental entity in the CDBG funding chain approved WDC's requisitions submitted for services performed under the 1994 contract. And the city itself never complained to WDC of its alleged noncompliance with the various contractual provisions in question until *after* WDC sued it for breach of contract. Thus, the evidence strongly suggested that the city's breach-of-contract claims were a post-hoc rationalization to support the new administration's decision to terminate the CURE project and to renege on its promise to pay for the services WDC already had rendered.

The city, of course, was entitled to reconsider whether the project should continue and whether WDC had met its contractual obligations. And any contractual compliance problems that existed might have and ought to have been remedied according to their terms. The city could not, however, frustrate the essence of its WDC contracts and withhold payment for services rendered by relying upon documentary omissions and other alleged deficiencies that it either failed to raise in a timely manner or actually condoned before alleging that they constituted material breaches of contract.

 "The doctrine of substantial performance recognizes that it would be unreasonable to condition recovery upon strict performance where minor defects or omissions could be remedied by repair." *National Chain Co.,* 487 A.2d at 135. Moreover, "[w]hether there has been substantial performance is a question of fact for the jury to resolve relying on all the relevant evidence." *Id.* Given the evidence of WDC's substantial performance, the trial justice's decision to take the breach-of-contract claims from the jury was erroneous. Further, in remanding these claims for a new trial, we hold that the breaches of contract cited by the trial justice, whether considered individually or collectively, did not, as a matter of law, constitute evidence of WDC's material breach of contract, nor did they justify the city's nonpayment for the work performed by WDC under the contracts.

## II

### Sufficiency of the Fraud Claim

 The trial justice also granted WDC's motion for judgment as a matter of law on the city's fraud claim. She explained that WDC was not "organized enough to form what I think would be the necessary intent to commit fraud * * *." As a result, she concluded, the city had failed to prove the required elements of fraud. To establish a prima facie case of common law fraud in Rhode Island, "the plaintiff must prove that the defendant 'made a false representation intending thereby to induce plaintiff to rely thereon,' and that the plaintiff justifiably relied thereon to his or her damage." *Travers v. Spidell,* 682 A.2d 471, 472–73 (R.I.1996). In viewing the evidence in the light most

favorable to the city, and without assessing the witnesses' credibility, we conclude that factual questions remain concerning the viability WDC's fraud claim about which reasonable minds could differ. *See Hernandez v. Fernandez,* 697 A.2d 1101, 1103 (R.I.1997); *Lutz Engineering Co. v. Industrial Louvers, Inc.,* 585 A.2d 631, 635 (R.I.1991). Moreover, as the following summary demonstrates, the city presented enough evidence on each element of its fraud claim to substantiate a prima facie case:[8]

■ 1. *A false representation.* WDC's subcontractor-architect testified that he fabricated an invoice at the request of a WDC employee for work that had not been performed. WDC's vice president confirmed this testimony. From this and other evidence a jury could conclude that WDC had deceived the city into paying for architectural services it had never received.

■ 2. *Knowledge of the statement's falsity.* WDC's president testified that she knew that no architectural services had been performed for the period covered by the invoice. Furthermore, the architect testified that a WDC employee had instructed him to fabricate the invoice. This evidence supports a reasonable inference that WDC knew its representations on the invoice were false.

■ 3. *Intent to induce reliance.* The architect's undisputed testimony was that a WDC employee instructed him to backdate the invoice in order to receive advance payment for work not yet performed. This conduct is at odds with the contract's requirement that WDC would be paid only for services already performed. And it supports an inference of WDC's intent to deceive the city on this invoice.

■ 4. *The city's detrimental reliance.* The evidence also showed that the city paid WDC for services that had not been completed based upon the phony invoice. Thus, at the very least, it would appear that the city may have paid for these services when no such payment was due, and suffered damages as a result.

In light of the foregoing evidence, we conclude that the trial justice erred in granting WDC's motion for judgment as a matter of law on the city's fraud claim.

## III

### Particularity of Fraud Claim

■ WDC also contends that the trial justice erred in denying its pretrial motion to dismiss the city's fraud counterclaim for the city's failure to plead it with the "particularity" required by Rule 9(b). Because of the posture of this case, however, this issue can be resolved with relative dispatch.

■ Even assuming arguendo that the city's fraud claim was unduly vague in some respects, we are convinced that any such defect has been cured via the particular fraud evidence that the city introduced at trial. Given that we are remanding this case for a new trial, the rule's purpose of giving fair and specific notice of the alleged fraud has been satisfied. *See* 1 Kent, *R.I. Civ. Prac.* § 9.2 at 92 (1969) ("What constitutes sufficient particularity necessarily depends upon the nature of the case and should always be determined in the light of the purpose of the rule to give fair notice to the adverse party and to enable him to prepare his responsive pleading."). Based upon the evidence that was introduced at the trial, WDC now has fair notice of what transactions and conduct the city alleged amounted to common

8. WDC does not directly contest any of the city's arguments in support of reversing the trial justice's decision on WDC's Super.R.Civ.P. 50 motion, relying instead solely upon the reasoning of the trial justice. We do not discuss all of the evidence marshaled by

the city in support of its fraud counterclaim and express no opinion on whether a factfinder should ultimately find in favor of the city on this claim. We conclude only that the city presented enough evidence to send its fraud counterclaim to the jury.

law fraud, thereby enabling it to prepare a focused defense to this claim on retrial. As a result, we deem the city's fraud pleading to have been amended (and limited) in light of the fraud evidence introduced at the trial. Thus, because the evidence adduced at trial has provided all the particularity that WDC needs to defend against this fraud claim, the trial justice's refusal to grant WDC's Rule 9(b) motion was not reversible error. Because the granting of any such motion typically would have included leave to file a more particularized pleading, *see* 1 Kent, § 9.2 at 93, this conclusion seems especially appropriate here.

## IV

### Attorney's Fee Awards

■ Given a proper contractual, statutory, or other legal basis to do so, the award of attorney's fees rests within the sound discretion of the trial justice. *See Greensleeves, Inc. v. Smiley,* 754 A.2d 102, 103 (R.I.2000); *Bucci v. Anthony,* 667 A.2d 1254, 1256 (R.I.1995). However, in light of what we have ruled to this point regarding WDC's breach-of-contract claims, we are constrained to vacate the trial justice's order awarding attorney's fees to the city under § 9-1-45 for WDC's assertion of supposedly nonjusticiable contract-based claims. Section 9-1-45 authorizes the award of attorney's fees in breach-of-contract actions when the court finds "that there was a complete absence of a justiciable issue of either law or fact raised by the losing party." For the reasons we have already discussed regarding the viability of WDC's breach-of-contract claims and the insubstantiality of the city's material-breach defense, such a finding was unwarranted here.

■ We also vacate without prejudice the trial justice's order under § 9-29-21 and Rule 11 awarding the city its attorney's fees related to the stay-of-execution proceedings. As the city itself admits in its brief, the determinations and assessments of attorney's fees in this case somewhat overlapped. We believe that the trial justice's decision to award Rule 11 sanctions, as well as the amount of the fees and expenses it assessed against WDC, may have been colored somewhat by her earlier determination that WDC had asserted frivolous breach-of-contract claims and then attempted to frustrate the court's judgment in favor of the city on these very claims. Even though the trial justice may decide at some later date that WDC still should be sanctioned for its misconduct in connection with the stay-of-execution proceedings, we conclude that justice would be best served by allowing the court to revisit all the facts relating to that issue after the retrial has concluded.

### Conclusion

For these reasons, we reverse, sustain the parties' cross-appeals to the extent set forth herein, and vacate (1) the judgment as a matter of law in favor of the city and against WDC on the breach-of-contract claims; (2) the judgment as a matter of law in favor of WDC on the city's fraud counterclaim; (3) the order awarding attorney's fees and expenses to the city pursuant to § 9-1-45; and (4) without prejudice, the award of attorney's fees and expenses to the city pursuant to § 9-29-21 and Rule 11. We also hold that, as a matter of law, the breaches of contract referred to in the trial justice's decision granting the city's Rule 50 motion do not constitute, either individually or collectively, material breaches of the contracts at issue here. Finally, we remand this case to the Superior Court for a new trial on the breach-of-contract and fraud claims consistent with this opinion.