[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This case is before the Court for adjudication on the merits. Top of the Hill, LLC and Frank Zammiello (Plaintiffs) bring this action for breach of contract, breach of warranty and a declaration of rights and duties arising from the sale of a restaurant. Camille's Roman Gardens, Inc. (CRG) and Gary Mantoosh (Defendants) raise a number of affirmative defenses and counterclaims, including breach of contract, fraud, and violation of G.L. 1956 § 9-29-21 requiring that every pleading, motion or paper filed with the court be signed by either the party or the party's attorney. The Decision is herein rendered in accordance with Super. R. Civ. P. Rule 52 by this Court without intervention of a jury.
 Introductory Facts and Travel
Camille's Roman Gardens Restaurant was a well-known Providence eatery. Gary Mantoosh (Mantoosh) was the president of CRG, which leased the real estate from a nonaffiliated entity, Camille's Realty, Inc. On August 8, 2001, Frank Zammiello (Zammiello), acting on behalf of Top of the Hill, LLC (TTH), entered into separate agreements with CRG and Camille's Realty, Inc. for the sale of the restaurant and realty respectively. The Purchase and Sale Agreement for the realty was executed on August 8, 2001. An undated Asset Purchase Agreement covering the restaurant equipment, licenses, and leasehold interest was executed by CRG and Zammiello (presumptively on or about the same date as the real estate Purchase and Sale Agreement). The asset sale was consummated at a closing which occurred on October 18, 2001. At the closing CRG and TTH executed an Escrow Disbursement Agreement and a Bill of Sale, Assignment and Assumption Agreement (Bill of Sale). Subsequently, TTH renovated and reopened the restaurant under the name, Camille's.
Shortly after the closing, in a letter dated October 22, 2001, the Plaintiffs' attorney, Anthony Bucci (Bucci), notified Defendants' attorney, Richard Mittleman (Mittleman), that the new owners had discovered that some pieces of equipment were in need of repair or replacement. Bucci asked whether the Defendants would prefer to address the equipment issues themselves or would prefer that the Plaintiffs undertake the repairs and submit the receipts for reimbursement. Mittleman replied that the restaurant had been operational until the closing date; at the time of the closing it was in good standing with the Department of Health, and the Plaintiffs had inspected the restaurant many times before the closing.
On October 28, 2001, Bucci responded via letter that Exhibit A of the Escrow Disbursement Agreement clearly reads "issuance of approval from the Rhode Island Department of Health (RIDH) necessary for the transfer of liquor license. Any work or requirements needed to be done to satisfy the Rhode Island Department of Health shall be paid by Camille's Roman Gardens, Inc. out of the escrowed funds." He repeated the Plaintiffs' insistence that the Defendants rectify the problems described in the October 22, 2001 letter and demanded that none of the escrowed money be distributed until a resolution was reached. The Defendants did not concur.
The Plaintiffs decided to undertake the repairs and replacements. Among other things, the Plaintiffs replaced two commercial ovens, installed a new hood fire system, bought a new commercial dishwasher and installed new sinks and plumbing. In total, the Plaintiffs expended over $100,000. Pls.' Ex. 6. While the Plaintiffs were making these outlays, the Defendants continued to resist paying any money towards the repairs, claiming that the Plaintiffs were attempting to rewrite the agreement to include a new kitchen. Pls.' Ex. 11, Letter from Defendant's Counsel to Plaintiff's Counsel (November 29, 2001).
On November 2, 2001, the Plaintiffs filed a complaint for declaratory judgment and a temporary restraining order to prevent disbursements from the escrow account to the Defendants. No order was issued by the Superior Court. Subsequently, the Plaintiffs amended their complaint to include claims for breach of warranty and breach of contract. The matter was assigned to the Business Calendar for trial, which commenced January 2004.
 Standard of Review
The rules of civil procedure provide that "in all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon." Super. Ct. R. Civ. P. Rule 52. Pursuant to this authority, "the trial justice sits as a trier of fact as well as of law." Hood v. Hawkins,478 A.2d 181, 184 (R.I. 1984). "Consequently, he weighs and considers the evidence, passes upon the credibility of the witnesses, and draws proper inferences." Id. Brief findings and conclusions are sufficient as long as they address and resolve pertinent controlling factual and legal issues.White v. LeClerc, 468 A.2d 289, 290 (R.I. 1983). An extensive analysis and discussion is not a measure of compliance with Rule 52. Id.
 The Written Agreements
The rights and obligations of the parties are governed by three documents: (1) the Asset Purchase Agreement, (2) the Bill of Sale and (3) a letter, referred to by the litigants as the Escrow Disbursement Agreement. The patchwork of provisions embodied in these three agreements form the legal framework of this case.
The Asset Purchase Agreement and the Bill of Sale constitute the keystone of the parties' agreement. First, both documents contain the seller's warrantee that "all the equipment and other tangible Assets used by Seller[1] in the operation of the Restaurant are in substantially good operating condition and repair subject to ordinary wear and tear." Asset Purchase Agreement Article 2.5(b); Bill of Sale Article 2. Second, Article 5.6 of the Asset Purchase Agreement contains the Defendants' condition precedent that, "Buyer shall obtain a transfer of Seller's liquor license." Thirdly and importantly, Article 2 and Article 7.1 of the Asset Purchase Agreement specifically provide that all representations and warranties of the Seller shall survive the closing.
TTH's condition precedent that it obtain a transfer of the Seller's liquor license was further detailed in the parties' Escrow Disbursement Agreement, which provides that:
 "The undersigned[2] has this day executed documentation evidencing, governing, and transferring the Assets to Top Of The Hill, LLC. Notwithstanding such execution and the recording for [sic] filing of any documents, instruments or agreements with the Rhode Island Secretary of State or the City of Providence land evidence records, the undersigned hereby acknowledges and agrees that you shall have no obligation to disburse any of the proceeds to Seller from the Sale of Assets unless the undersigned has provided to you all the items and satisfied all of the conditions set forth in exhibit A attached hereto, all in form and substance satisfactory to you."[3]
The pertinent provision of Exhibit A is found at number 4:
 "Issuance of approval from the Rhode Island Department of Health necessary for the transfer of the liquor license. Any work or requirements needed to be done to satisfy the Rhode Island Department of Health shall be paid by Camille's Roman Gardens, Inc., out of the escrowed funds. (Emphasis added)
According to the Defendants, the parties agreed that the property — the realty, improvements and its fixtures as defined by the Purchase and Sale Agreement — would be sold "as is." Indeed, this is what is contemplated in the Purchase and Sale Agreement executed by TTH and Camille's Realty, Inc. The pertinent language of that agreement reads as follows:
 "Buyer has inspected or will inspect the property and is purchasing the same "AS IS" and "WHERE IS," without any representations or warrantees express or implied by Seller or any agent of Seller, and without recourse to Seller, regarding the condition or use of property. . . . Property to be then in the same condition as it is now, reasonable wear and tear and damaged by casualty excepted. Buyer shall be entitled to inspect the property prior to the delivery of the Deed to determine compliance with this provision." (Article 5.1)
However, the Purchase and Sale Agreement clearly has no application to this case. The Defendants were not a party to the Purchase and Sale Agreement and the conveyance of the realty is not at issue in this case. Therefore the "as is" language pertaining to the realty has no impact on the sale of assets by the Defendants.
The controlling terms are contained within the Asset Purchase Agreement. There, CRG warranted that the equipment and tangible assets were in "substantially good operating condition subject to ordinary wear and tear." Furthermore, the clear intent of the parties was that the warrantee was to survive the closing.
 The Health Department Write-up
Eileen Marshall (Marshall), an environmental health food specialist in the Food Protection Division of RIDH inspected the restaurant three times after the closing. Tr. at 13; Pls.' Ex. 1, 2, 3. The purpose of her inspection was to ensure that the new owners of Camille's operated the restaurant within the parameters of the health code so as to obtain a food business license. Tr. at 27, 81. The foundation of the Plaintiffs' case is found in Marshall's write up of her November 8, 2001 inspection, where she made the following 19 observations:[4]
 1. "CERT. MGR required: H. Jackson Donoyan must contact Jan McLaughlin at 222-2749 to change certification[5] site:
 2. Menu required.
 3. Food employee reporting agreement (sick policy) required.
 4. All kitchen equipment working: refrigeration working to keep P.H.F 41° F or colder. Gaskets must be in good repair, shelves clean, lights shielded or shatter proof.[6]
 5. Culinary (food) sink required with indirect drainage.
 6. Wall behind cookline in poor shape — must be smooth, washable, durable material like glassboard, s/s.
 7. Adequate mechanical ventilation hood over cooking dishwashing areas to remove steam, grease, noxious odors.
 8. Ceiling tiles required- smooth, durable, washable-vinyl coated gypsum.
 9. Coved molding required throughout kitchen at floor/wall junctures.
 10. Sprayer hose at rinse sink near dishmachine requires backflow/back siphoge preventer-WATTS 8.A.
 11. Sanitizing sink required to sanitizing pots and pans.
 12. Bar area [not at issue in this case].
 13. Basement area
 a. Walk-in refrigerator and freezer require shielded or shatterproof light bulbs
 b. Condesate drain line must be indirect to sewage
 c. Adequate shelves to hold food keep 6 inches above food.
 d. All units must properly operate- No frost or ice buildup
 e. Mop sink/service sink required.
 f. Grease trap must be approved by Narr. Bay Water Quality Commission.
 14. Restrooms require
 a. mechanical ventilation (fan)
 b. Self-closing doors
 c. Ladies covered waste receptacle
 15. All outer openings — gaps around doors or pipes must be protected from pest entry
 16. Dumpster and grease barrel (rendering container) required. Containers must be kept on durable, washable surface.
 17. "Choke — saving" poster must be displayed in dining area.
 18. Thorough detailed cleaning in the entire establishment
 19. All unnecessary, dilapidated equipment must be removed if not needed.
 All above must be addressed prior to opening. Reinspection Mon. 11-26 in morning."
When Marshall returned on November 26, she wrote:
 "Establishment currently under renovation at time of inspection. Refrigeration, sinks, ovens, must be connected.
 Equipment in poor shape- 2 wolf ovens, Traulsen refrigerator, Autochlor dishmachine, pot sink, food rinse sink, Delfield steam table and refrigerator, walk in refrigerator and freezer, lighting must be replaced."
On Marshall's last visit, December 26, 2001, she made some additional observations about minor pre-opening issues and approved the restaurant for operation as a full service restaurant.
 Findings of Fact
The week-long trial yielded utterly conflicting testimony on practically every point. Long time employees, including Mantoosh, who were very familiar with the restaurant's operation prior to the sale, could not even agree on whether there was a fan in the women's restroom, let alone on the operability of industrial-grade restaurant equipment. Additionally, the credibility of two plaintiffs' rebuttal witnesses was called into question so much so that the Court felt compelled to make a referral to the Attorney General for perjury. Tr. at 808-32.
The Plaintiffs' star witness was Eileen Marshall. Although she was undoubtedly qualified to speak to Rhode Island Health Code requirements, her testimony failed to prove the Plaintiffs' case. Her inspection was admittedly for guidance rather than enforcement since the restaurant was not prepared to open and had no menu upon which to base her evaluations. Tr. at 49, 50, 51, 86, 87. Some of Marshall's observations were not based on actual provisions of the Food Code and apparently some "requirements" were more akin to "guidelines" or preferences rather than mandates. Tr. at 38, 39, 55, 98.
Additionally, Marshall had no mechanical or electrical training and so only made visual observations. Tr. 85. For example, she observed that a refrigerator was not the right temperature, but she could not determine why. Tr. at 90, 91. It could have been because there was no food in it, or because the electricity had been turned off by an electrical contractor, or because there was something minor wrong with the compressor. Id. Although her second written report said that the refrigerator was in "poor shape," when she testified in court, she admitted that as long as the refrigerator could be made to maintain food at 41 degrees, there was no health code violation.[7] Tr. at 94.
Lastly and most importantly, Marshall was not able to testify as to what criteria, if any, the RIDH must consider prior to giving its approval for the transfer of a liquor license. Not only did she not have the authority to issue such approval, she had no knowledge of the requirements for such approval, and, when conducting her investigation, did not know that TTH was applying for a liquor license. Tr. at 73, 81, 168, 169.
The testimony of every other witness for the Plaintiff was equally inconclusive. At no time during the trial was anyone able to testify to the RIDH requirements for granting approval as it pertains to a liquor license rather than a food license. Of the 19 observations that Marshall made, the Court is uncertain which, if any, would have resulted in the RIDH not giving its approval. Tr. at 54, 103, 106. It was not even established that the RIDH required an inspection for liquor license transfer purposes.
The joint stipulation filed by the parties similarly does not aid the Court. During the trial, the Court sitting as fact finder inquired whether anyone would testify about the RIDH requirements as it relates to a liquor license. Tr. at 275, 276, 277. In response, the Court was informed by the Plaintiff that no witness would testify because a stipulation had been agreed to. Id. The stipulation placed into evidence merely establishes that (1) the Board of Licenses for the City of Providence is the administrative agency authorized to grant a liquor license transfer, (2) the Board must receive approval from the Department of Health, the Fire Department, the Police Department and the Building Department and (3) appropriate approval was received by all of the above in reference to TTH's transfer application. The critical nexus between the generalized facts contained in the stipulation and the particular legal standard that must be met by the Plaintiffs, whatever that may be, has not been established.
The Court finds that the Plaintiffs did not prove by a preponderance of the evidence that Mantoosh breached his contract or the warrantees therein. The health inspector write-up coupled with unconvincing testimony, does not persuade the Court that the assets not were delivered in "substantially good operating condition subject to normal wear and tear." The Court does not find any probative evidence of (1) the meaning of normal wear and tear as it applies to restaurant equipment, (2) the point at which the equipment was not in good operating condition and (3) the value of what TTH received compared to the value of what was warranted.
Once a status or condition is proved to exist, there is a presumption of continuance. Lund v. Town of Hempstead, 941 F.2d 1271, 1288 (2d. Cir. 1991). "[T]he presumption of continuity is a reasonable grounds on which to draw inferences where (1) a situation or the circumstances surrounding it do not go through an apparent material change and (2) the lapse of time is not great enough to suggest that unknown circumstances or causes in the normal course of events will have changed the situation." Id. It is undisputed that Camille's Roman Gardens Restaurant had no outstanding health code violations, its liquor license was in good standing and it was serving lunch and dinner up until the day of the closing. Tr. at 166, 167, 171, 647-650, 671, 673, 696, 698, 707. Therefore the reasonable inference is that everything was in as good condition as warranted when the Plaintiffs received title.
Furthermore, the equipment at issue was not preserved, but was removed from the premises and apparently disposed of. Tr. at 325-327. Rhode Island adheres to the legal doctrine, "omnia praesumntur contra spoliatorem," or in other words, "all things are presumed against a despoiler or wrongdoer." Tancrelle v. Friendly Ice Cream, Corp.,756 A.2d 744, 748 (R.I. 2000). When a party to litigation deliberately or negligently destroys relevant evidence, the finder of fact may infer that the destroyed evidence was unfavorable to that party. Id. "Although a showing of bad faith may strengthen the inference of spoliation, such a showing is not essential. Id. An obligation to preserve evidence even arises prior to the filing of a complaint where a party is on notice that litigation is likely." Id. at 749. Here, the Court finds no bad faith conduct on the part of the Plaintiff. However, the Plaintiffs, having filed a law suit about the condition of the assets within weeks of the closing, should have preserved the equipment that they allege was in contravention of Mantoosh's warrantees. Having the equipment might have eliminated the need to rely on rather inexpert witness testimony as to its operability.
 Counterclaims
CRG and Mantoosh assert three counterclaims: breach of contract, fraud and violation of § 9-29-21. The Court finds no evidence in support of any of the counterclaims. Section 9-29-21 requires that all pleadings and motions be signed by a party or the party's attorney. The counterclaim complaint does not specify which documents were submitted to the Court in violation of § 9-29-21 and no evidence was adduced during trial to support the claim.
As the to the claim for fraud, paragraph 7 of the counter-claim complaint states:
 "Upon information and belief the Counterclaim Defendants knowingly, intentionally, and materially made misrepresentations of fact to the Counterclaim Plaintiffs upon which the Counterclaim Plaintiffs relied in entering into the October 18, 2001 writing, as upon information and belief the Counterclaim Defendants at all times material hereto wrongfully intended to unlawfully use the October 18, 2001 writing to attempt to extort funds from Counterclaim Plaintiffs to pay for the Counterclaim Defendants' voluntary renovations to the subject premises."
The counterclaim complaint does not identify any misrepresentations made by the TTH or Zammiello. During the trial there was no evidence that TTH or Zammiello made a false representation and intended to induce the CRG or Mantoosh to rely on that representation. Women's DevelopmentCorp. v. City of Central Falls, 764 A.2d 151, 160 (R.I. 2001). Moreover, when Mantoosh testified on behalf of the Counterclaim Plaintiffs, his testimony did not touch on the Counterclaim Defendants' statements or justifiable reliance. Id.
Lastly, the Counterclaim Plaintiffs fail to put forth evidence that the Counterclaim Defendants breached their contract. Paragraph 9 of the counterclaim complaint alleges that:
 "The Counterclaim Defendants are in breach of the Purchase and Sale Agreement as they refused to close the subject transaction unless the Counterclaim Plaintiffs executed the October 18, 2001 writing, Exhibit A hereto."[8]
Zammiello testified that at the closing, he had concerns that the liquor license would not be transferred because the building and the kitchen was old. Tr. at 421, 521, 522. Transfer of the liquor license was critical because "without that, [the sale of business] was a useless transaction." Tr. at 421. Provision 4 of the Escrow Disbursement Agreement was executed to address those concerns. Tr. at 422. There was no testimony that if the Escrow Disbursement Agreement was not entered into, then Zammiello and TTH would not have gone through with the closing. After considering the sparse record on this subject, the Court cannot find, by a preponderance of the evidence, that the Counterclaim Defendants breached their contract.
 Conclusions
In conclusion, the Plaintiffs have not carried their burden of proving, by a preponderance of the evidence, that the Defendants breached either the terms and warrantees of the Asset Purchase Agreement, Bill of Sale or Escrow Disbursement Agreement. The evidence before the Court does not support a finding that the restaurant was not delivered to the Plaintiffs in "substantially good working order" or in a condition that would prevent the liquor license from being transferred. Likewise, the Court does not find merit in the Defendants' counterclaims against the plaintiff. Order and judgment to enter consistent with this decision.
[1] CRG.
[2] CRG and TTH.
[3] The use of the pronoun "you" in the Escrow Disbursement Agreement is ambiguous. The term is neither defined in the letter nor can it be ascertained by context: the letter is addressed to Mittleman, but the salutation reads, "Gentlemen." Furthermore, the language "you shall have no obligation" is curious because it gives the escrow agent discretionary power over disbursements.
[4] Dates in margin omitted.
[5] In margin: within 10 days.
[6] In margin: Traulsen refrig 42° F.
[7] This finding should not be construed to mean that violation of the health code is ipso facto a breach of the parties' agreements that the assets be in "substantially good operating condition subject to normal wear and tear." Furthermore, there is no evidence that abatement of all health code violations is "necessary" to get RIDH approval for a liquor license transfer.
[8] Exhibit A to the Counterclaim Complaint is a copy of the Escrow Disbursement Agreement.