[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This matter was tried before the Court, jury-waived, in May and June 2005.
 Findings of Fact
In the 1970s Anthony Geruso organized Promac, Inc. to provide property management services to residential housing complexes. Gerald Zito and Henry Kates (through various legal entities) were investors in various federally subsidized residential housing complexes. Mr. Kates and Mr. Zito were principals of Vulcan Associates I, a limited partnership, which owned a number of different buildings in Woonsocket, Rhode Island. Mr. Zito was a general partner.
In March of 1984 the parties entered into a written management agreement, Exhibit 1. Vulcan was a party to the 1984 management agreement. Although Mr. Zito is a general partner of Vulcan Associates I, the agreement was signed by Henry Kates as "General Partner, Kates Properties."
The management agreement provided broad authority to Promac to operate the housing operations. Promac quickly assumed management responsibility and was allowed to operate the housing operations without any significant limitations. Promac would receive the checks and rents, rent the units, handle all repairs including subcontractors, and provide monthly and quarterly reports to the partnership. In return Promac received commissions from a "Rental Agency Account" which it controlled. While Vulcan received income and reports, it left most management issues to Promac to resolve. On at least one occasion, Promac went several years without receiving any specific direction or communications from the defendants.
Promac continued to use its broad authority to operate the apartments of the residential development for approximately ten (10) years. During much of this time, Mr. Zito was in Europe.
In early 1993, Mr. Zito mentioned to Mr. Geruso that he desired to sell Vulcan's housing units upon his return from Europe. At a luncheon meeting shortly thereafter, Mr. Kates, Mr. Zito and Mr. Gordon Ondis struck an agreement for the sale of Vulcan Associates, I. When a purchase and sales agreement[1] was eventually signed, Mr. Geruso was told that the property management agreement for Promac would be terminated as the new owners of Vulcan Associates would perform management services. Promac was given about two week's notice of the termination, and became quite disgruntled.
Promac contended it was still owed $18,694.70 from Vulcan (Exhibit 2). Mr. Geruso informed Mr. Zito that none of the financial records would be delivered until Promac was paid.
On April 10, 1993 the owners of Vulcan met at the local offices of the United States Department of Housing and Urban Development.[2] After the HUD negotiations, Promac and Vulcan agreed to have an accounting firm audit the financial records and determine the amount of monies due to one another. Vulcan suggested using Mr. Champi's accounting firm and Promac promptly consented. Although the conversations with HUD were in April 1993 Vulcan did not follow through. In May 1993, Vulcan demanded all of the paperwork for the closing and in late June of 2003, Vulcan again demanded all files and records be transferred. Even though Vulcan was claiming that Promac owed some $44,000, (Exhibit Q) it was not until October of 1993 that Vulcan hired Mr. Champi's accounting firm to complete the audit.
In mid January 1994 the audit was completed, and a meeting took place at Mr. Kates' restaurant in Providence. Mr. Champi reported that $11,100 was due Promac. At that meeting, Mr. Zito and Kates indicated that this entire amount due to Promac would be paid in thirty (30) days. Mr. Geruso replied that all books would then be delivered to Vulcan forthwith.
Some records were delivered, some not. Money was never paid to Promac so Promac instituted this action.
 Analysis 1. The liability of Mr. Kates.
Mr. Kates was named as a Defendant with personal liability when the suit was filed in 1997. In 2005, the Defendants moved for summary judgment claiming that Mr. Kates was neither a General Partner, nor proper party. As there appeared to be a genuine issue of material fact, the Court denied the motion for summary judgment without prejudice.
At trial, Mr. Kates acknowledged that he executed the management agreement, Exhibit 1. However, he testified that he signed it in blank and that someone else wrote in the words "General Partner, Kates Properties." Kates Properties is not a party to the management agreement, and the management agreement is between "the owner" and Promac, Inc., a Rhode Island Corporation . . .
A review of the document itself leads the reasonable person to conclude that Mr. Kates was acting as a General Partner by executing the agreement. In any event, by signing in blank, he willingly left himself at substantial risk. He was signing personally. He made no attempt to distinguish his personal obligations to that as a limited partner or as an officer of a corporation. Mr. Kates personal liability in this action is not diminished. Rather, as he identified himself as a general partner on the document, he is obligated as such. See 731 Airport Associates v. H M Realty Associates, LLC, 799 A.2d 279, at 282 (R.I. 2002), citingMenard Co. Masonry Building Contractors v. Marshall Building Systems,Inc., 539 A.2d 523, 526 (R.I. 1988).
2. Liability and Contract
The 1984 management agreement contained all the essential elements necessary to constitute a contract. It identified the parties to the contract. It contained the essential terms including the duties of each party, the management plan, the process for renting units, collecting rents, performing repairs, hiring employees, obtaining insurance, maintaining a rental account, providing reports, compensation of Vulcan and the terms of the contract. The contract would extend from year to year unless terminated with 30 days notice. (Exhibit 1, paragraph 27).
The elements of a contract are well-established in our case law:
 The long-recognized essential elements of a contract are "competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation. Rhode Island Five v. Medical Associates of Bristol County, Inc., 668 A.2d 1250, 1253 (R.I. 1996), citing Black's Law Dictionary 322 (6th ed. 1990), and Lamoureux v. Burrillville Racing Association, 91 R.I. 94, 98, 161 A.2d 213, 215
(1960)).
The management agreement created a binding, enforceable contract. From 1984 through 1993 the parties attempted to comply with the agreement and Promac was given significant latitude in keeping Vulcan's investments in good repair and profitable.[3] Promac was proactive in attempting to protect and expand Vulcan's assets.
Promac, through Mr. Geruso informed Vulcan that none of the records would be delivered until Promac was paid. This appears to have been a reasonable position, in that a long-term agreement was coming to an end and the founders of Vulcan seemed to be leaving the business. Moreover, it was not questioned that Promac had performed the contract and sought to assist Vulcan (over and above its contractual obligations).
The Court finds that at the January 1994 meeting at the Gatehouse, Vulcan Associates I, agreed that Mr. Geruso would be paid $11,110 within thirty (30) days. It is interesting to note that HUD never issued any sanctions for the failure of its approved management agent to transfer the books or keys, nor did Vulcan ever initiate litigation. Instead, the debt remained unpaid.
Though the audit report was completed over six months after the conclusion of the contract, there were no findings of major impropriety on the part of Promac. If anything, Promac had been over-vigilant by attempting to obtain historic district tax credits for Vulcan, but the funds were all spent in improving Vulcan's assets.
In the summer of 1993, the assets of Vulcan were sold to Mr. Gordon Ondis,[4] and management of the rental units was transferred. Mr. Ondis testified at trial, contending that Vulcan was due money because keys were never transferred for the various rental units. There was significant animosity between Mr. Ondis and Mr. Geruso. A receipt for keys was produced, but was never made a full exhibit. After the closing, there were no written demands made to Mr. Geruso for the keys, and apparently there were no complaints made to the U.S. Department of Housing and Urban Development (HUD). The Court questions the credibility of Mr. Ondis. His memory was selective even on critical issues, and his testimony was self-serving, deviating significantly from that of others.
Vulcan never offered an explanation as to why Promac was not paid. While Promac may have shown its displeasure over the sale to Mr. Ondis, this did not justify failing to pay Promac. Vulcan acknowledged that Promac performed its services diligently for many years. Vulcan agreed to line up the auditor but delayed months in doing so. Vulcan agreed to abide by the terms by the results of the audit, but did not.
Mr. Zito, a principal of Vulcan, clearly depended on Promac's services for many years. While he painted a dark picture of Promac, Mr. Zito's testimony was in conflict during cross-examination. He could not recall how Vulcan completed its tax returns without records, why he did not enlist the assistance of HUD, why he never commenced litigation for the tenant records and keys, and how adjustments were made at the closing if Vulcan did not have bills and receipts. In fact, no closing documents for the sale to Mr. Ondis were introduced.
Vulcan, when it was under the control of Mr. Ondis, claimed that keys or tenant records were due, but the sale of Vulcan (and transfer of its properties) took place without incident. Vulcan never wrote to demand the keys or initiated suit, instead, it waited for Promac to file suit some six (6) years later. Accordingly, Vulcan never met its burden of proof that it was owed funds on account, or keys, or essential documents.
While Mr. Geruso's memory of events occurring twelve (12) years before trial was not precise, he clearly remembered the major events and candidly revealed where his memory was lacking. While the Court found Mr. Geruso credible, he appeared strongly motivated by his belief that Promac had served Vulcan well for over fifteen (15) years, proactively seeking to increase Vulcan's worth, only to be accused of shortchanging Vulcan in the end. Even when the auditor established that Promac had been shortchanged, he attempted to be fair, not resorting to litigation until there was no alternative.
The Court concludes that judgment should enter in favor of Promac in regard to Count One of the Complaint. As recovery is allowed on the contract, an action for quantum meruit is inappropriate. See MarshallContractors, Inc. v. Brown University, 692 A.2d 665, 671, (R.I. 1997), footnote 3, and judgment shall enter for Vulcan on Count Two of the Complaint. Judgment is entered in favor of Plaintiff Promac in regard to Vulcan's Counterclaim.
3. Damages.
Promac has established that it was owed $11,100 as of the date of the termination, July 1, 1993. Exhibit G clearly substantiates this amount is due from Vulcan. Though the letter may attempt to distinguish which owner of Vulcan is responsible for the debt, this is irrelevant to Promac. The principal amount of $11,100 is due.
4. Attorney's fees.
There appears to be no express provision in the written contract for payment of attorney's fees. However, attorney's fees are allowed pursuant to R.I.G.L. § 9-1-45 when the court finds there was a complete absence of a justiciable issue of either law or fact raised by the losing party. Our high court has shown its reluctance to affirm a grant of attorneys fees where any justiciable issue is presented. Women'sDevelopment Corp. v. City of Central Falls, 764 A.2d 151,162 (R.I. 2001), Greensleeves, Inc. v. Smiley,754 A.2d 102, 103 (R.I. 2000), Johnson v. Howarth,700 A.2d 612 (R.I. 1997). The conflicting testimony of the witnesses relative to the return of keys and financial records presented a justiciable issue of fact; hence the Plaintiff is not entitled to an award of attorneys fees.
 Conclusion
Judgment shall enter in favor of Plaintiff, Promac, Inc. against Defendants Vulcan Associates I, Gerald Zito and Henry Kates, jointly and severally, for $11,100 prejudgment interest, post judgment interest and costs.
[1] The date of the purchase and sales agreement was never placed into evidence, but the termination discussion occurred in February or March of 1993.
[2] It was never established that Promac was present or represented at this meeting.
[3] Promac and Vulcan cooperatively worked together for over eighteen (18) years, even before the 1984 agreement. (Exhibit P).
[4] While no evidence was presented, this appears to have been achieved through a stock sale.