BONNIECREST DEVELOPMENT
COMPANY et al.

v.

Robert D. CARROLL.

No. 81–261–M.P.

Supreme Court of Rhode Island.

May 24, 1984.

Michael P. DeFanti, Hinckley, Allen, Salisbury & Parsons, Providence, for petitioner.

Robert M. Silva, David F. Fox, Robert M. Silva, Ltd., Middletown, for respondent.

## OPINION

MURRAY, Justice.

This is a petition for certiorari which seeks the review of a trial justice's grant of a motion to attach a certain parcel of real estate despite the respondent's prior release of all remedies affecting title in the specific res. The facts in pertinent part to this petition will follow.

The respondent, Robert D. Carroll (Carroll), filed a complaint in Superior Court on September 26, 1980, alleging that certain real estate located in Newport County was unlawfully conveyed by its owner in derogation of his ownership rights. In his complaint, Carroll specifically averred that the Bonniecrest Mansion (Bonniecrest) was conveyed by Chartier Real Estate Company (Chartier) to Bonniecrest Development Company (BDC) after Chartier had already bound itself to sell the property to Bonniecrest Associates (Associates). Associates was a joint venture partnership formed in 1978 by Gino Marchetti (Marchetti), Jack Joseph (Joseph), and Carroll for the express purpose of developing Bonniecrest as a condominium resort. Carroll further alleged that BDC had full knowledge of the prior purchase-and-sale agreement executed between Chartier and Associates, was not a bona fide purchaser of Bonniecrest and consequently took title to Bonniecrest subject to his rights.

On March 9, 1979, Chartier and Associates executed a purchase-and-sale agreement for the purchase of Bonniecrest. One of the conditions of sale in the contract required that Associates notify Chartier of its intent to close the deal within sixty days of its obtaining final zoning approval. Associates procured final zoning approval on April 26, 1979, but was unable to obtain the requisite financing before its agreement term expired—May 14, 1980.

Unable to meet its obligations under the March 9 contract, Associates met with Chartier on May 14, 1980, and negotiated a three-month extension period to consummate the sale. As a result of a later meeting that same day among Chartier, Marchetti and Joseph, respondent alleges that he was excluded from any further participation in the Bonniecrest development project. Marchetti and Joseph apparently then negotiated a new purchase-and-sale agreement with Chartier on May 20, 1980. This agreement was executed by Chartier and Marchetti that day with the latter purporting to act as trustee for Associates. This new agreement, unlike the original one executed on March 9, 1979, now required a nonrefundable $50,000 deposit to be paid by Associates.

Marchetti and Joseph apparently were still unable to obtain the necessary financing individually. Marchetti then contacted Henry Kates (Kates), the president and chief executive officer of New England Financial Group, to assist Associates in obtaining financing for the project. This Kates did in return for a certain equity interest in the Bonniecrest development. Sometime prior to August 15, 1980, Marchetti, Kates, and Joseph Chazan (Chazan) created a new partnership, BDC.[1]

On or about August 15, 1980, before Associates' three-month extension period to purchase Bonniecrest had expired, Louis J. Chartier, as president of Chartier, executed a deed conveying Bonniecrest to BDC.

Prior to this conveyance, Kates had demanded and received from Marchetti an agreement that would indemnify Chazan or him from any claims that might be asserted against Kates by Carroll.

Concurrent with the filing of his suit, respondent filed a notice of lis pendens against Bonniecrest. As a result, Old Colony Co-Operative Bank refused to close on its loan agreement with BDC since BDC would technically be in default of a specific

1. According to respondent, Marchetti and Joseph agreed that Joseph would receive a fraction of Marchetti's share of BDC's profits, apparently as consideration for Joseph's having been excluded as a principal of BDC in order to facilitate the Bonniecrest transfer.

provision in the construction loan.[2] In an apparent attempt to solve its financing problems, BDC states that it paid respondent $20,000 on January 8, 1981 to obtain his release. This release provided:

"I, Robert D. Carroll * * * do hereby remise, release and forever quitclaim * * any and all claims affecting title to [Bonniecrest] * * *.

"It is the intent of this release to foreclose only those remedies of Plaintiff affecting title to the subject real estate but not to extinguish any claim or basis for liability or any remedy *not affecting title to the real estate* otherwise available to the Plaintiff."

Release dated January 8, 1981. (Emphasis added.)

On January 6, 1981 BDC assigned and conveyed to Bonniecrest Condominium Development Company (BCDC) all of their right, title and interest in Bonniecrest. The BCDC had as its principals the same owners of BDC. Subsequent to respondent's execution of the above release, BCDC closed upon the construction loan with Old Colony and commenced construction.

On April 22, 1981, respondent filed a motion for permission to attach Bonniecrest in the amount of $2,500,000 to protect his claims in this litigation. Said motion was granted by the trial justice on May 14, 1981. On May 15, 1981, BDC, Kates, Chazan, and Marchetti brought a petition in this court for the issuance of a writ of certiorari and moved that we temporarily stay the trial justice's order granting Carroll's motion to attach Bonniecrest. Said stay was granted in an order of this court dated May 15, 1981.

The petitioners' request for a writ of certiorari was granted on July 16, 1981.

433 A.2d 685. On September 25, 1981, pursuant to respondent's request for a protective order,[3] we continued the stay previously granted to petitioners and ordered that any sales proceeds from Bonniecrest should be applied in the following manner:

"2. Petitioners shall apply the net proceeds of the sale of the development rights to any portion of the condominium project, known as 'Bonniecrest', toward a reduction of the current mortgage indebtedness of Bonniecrest Condominium Development Company consisting of $2,500,000 mortgage to Old Colony Co-Operative Bank dated and recorded in the Land Evidence Records for the City of Newport, Rhode Island, on the 8th day of January, 1981, in Book 300 beginning at Page 585, as well as, an equity mortgage to Newport National Bank in the amount of $400,000 dated and recorded in the Land Evidence Records for the City of Newport, Rhode Island, on the 9th day of September, 1981, in Book 304 beginning at Page 287.

"3. The net proceeds of the sale of any individual condominium units by Bonniecrest Condominium Development Company shall be applied:

1. to the reduction of the remaining mortgage indebtedness of the Bonniecrest Condominium Development Company,

2. to the payment of all the ordinary expenses and liabilities of the Bonniecrest Condominium Development Company, and

3. to the return of actual capital contributions made by the partners of Bonniecrest Condominium Development Company.

4. No profits or salaries shall be paid to any of the partners of Bonniecrest

---

**2.** Clause 2(b) of this construction-loan document explicitly provided that a default would occur if

"[e]ither the Mortgaged Premises or any portion of the unadvanced proceeds of the loan are under actual or purported attachment, garnishment or trustee process or any lien * * * or

other encumbrance exists which might take priority over the mortgage."

**3.** The respondent was apparently concerned that Bonniecrest was now about to be sold by petitioners and that such sale would impair his source of recovery should he be successful in his pending litigation.

Condominium Development Company until further order of this Court."

■ This petition raises two narrow issues. These include: (1) whether the trial justice's grant of a prejudgment attachment on Bonniecrest is an interlocutory or a final order for the purposes of our review and (2) whether respondent's execution of the release dated January 8, 1981, precluded him from procuring such order. As a preliminary matter, we necessarily address the procedural aspect of this case.

In *Cull v. Vadnais,* R.I., 406 A.2d 1241 (1979), we considered this same issue, and rejected the defendant's argument "that an order granting a prejudgment attachment has injurious consequences that vest in that order elements of finality,"[4] *Id.,* 406 A.2d at 1243, which make it appropriate for our review.

In discussing the history of interlocutory review of prejudgment attachment orders, we stated in *Cull* that

"an order *vacating* a prejudgment attachment possesses elements of finality because the injury apprehended is clearly imminent and irreparable. *Eidam v. Eidam,* 108 R.I. [673] at 681, 279 A.2d [413] at 417–18. However, we believe that *usually* no harm befalls defendants subject to prejudgment attachment orders in respect to real estate because prejudgment attachments do not obliterate property rights. Instead, these attachments merely prevent defendants from disposing of their real property before the trial court can determine whether they are liable. * * * We thus hold as a general rule that because orders granting prejudgment attachments of real estate are

interlocutory and involve no threat of hardship or injury, such orders do not fall within the *McAuslan* doctrine." (Emphasis added.) *Id.,* 406 A.2d at 1244.

We noted further in *Cull,* however, that there may be cases in which orders granting prejudgment attachments lead to sufficiently injurious consequences as to be properly appealable within the *McAuslan* rule. *Id.,* 406 A.2d at 1244 n.4. Although we consider such cases out of the ordinary and seldom encountered, the circumstances underlying this petition are sufficiently unusual that it warrants our immediate review.

This is a multi-million-dollar real estate development project in which petitioners' loan commitments were fully jeopardized by respondent's actions. By virtue of the filing of respondent's notice of lis pendens and his procurement of a prejudgment attachment order, defaults were created under BCDC's construction-loan agreement with Old Colony Co-Operative Bank. These defaults threatened the entire loan package. The filing of the notice of lis pendens caused an initial delay of three months in closing upon the loan and resulted in a refusal to advance construction funds to BCDC to permit it to commence building. The filing of the writ of attachment created a technical default under the $2,500,000 construction-loan agreement which, if uncured, would prevent BCDC from receiving any additional funds to finance its development. These are the types of circumstances that could doom the financial success of a project from its outset[5] and create the types of consequences

---

**4.** *See McAuslan v. McAuslan,* 34 R.I. 462, 83 A. 837 (1912).

**5.** As one commentator has recently remarked in the context of permanent real estate financing, "the most significant step in the acquisition and development of real property is the commitment for the permanent first mortgage loan. Surely it is the *sine qua non* of the construction process because it finances a substantial proportion, if not all, of the cost of development, including site preparation and sometimes the actual cost of acquiring the

raw land. Its importance is underscored by the fact that the cost of the mortgage financing is the largest single factor in spelling future success or failure in the ownership and operation of the development. A difference in a percentage point of interest or stretching out of the term of the loan may have enormous impact on the developer's cash flow, turning it from positive to negative or vice versa.

"[T]he permanent first mortgage has been historically and, to a large extent, to this day the

that are sufficiently injurious as to warrant immediate review.

■ The second issue raised in this petition challenges the trial justice's grant of respondent's motion to attach Bonniecrest. Specifically, petitioner contends that respondent's execution of the release dated January 8, 1981, constituted a valid waiver of all of Carroll's rights to affect title in Bonniecrest, thereby precluding the award of the prejudgment attachment obtained by respondent below. A plain reading of the release at issue here convinces us that petitioner is correct.

■ It has long been the rule in Rhode Island that an attachment "creates a lien on the property attached which is held in the custody of the law to satisfy such judgment or decree as the plaintiff may obtain." *In Re Gibbons*, R.I., 459 A.2d 938, 939 (1983) (quoting *Everett v. Cutler Mills*, 52 R.I. 330, 333, 160 A. 924, 925 (1932)). "The later judgment does not create a new lien, but relates back to satisfy the earlier attachment by subjecting the attached property to satisfaction of the subsequent judgment." *In Re Gibbons*, 459 A.2d at 939 (quoting *In re Suppa*, 8 B.R. 720, 722 (Bkrtcy. D.R.I.1981)). An attachment upon real property therefore constitutes a lien thereon from the date it is filed in the records of land evidence pursuant to judicial authorization.

■ It is axiomatic that a lien upon real property is a remedy that affects title therein. This is so because an attachment cannot be defeated by a conveyance of the attached property. *In Re Gibbons*, 459 A.2d at 939–40. A grantee of attached property takes title subject to the rights of the attachment holder, and such holder may enforce his lien through a sale of the attached property.

■ In the case at bar, respondent waived all remedies "affecting title" in Bonniecrest through the execution of the release. Unless such release was procured by petitioners through fraud, misrepresentation, over-reaching, or a material mistake upon the part of either party, it is valid and binding upon respondent. *See Griffin v. Bendick*, R.I., 463 A.2d 1340, 1345 (1983) and *Boccarossa v. Watkins*, 112 R.I. 551, 313 A.2d 135 (1973). The rationale for this rule is twofold. It represents both sound administrative policy and a pragmatic approach to civil-dispute resolution.

"[S]ettlements serve a valuable function by disposing of controversies before they enter the court system, thereby relieving the congestion on our dockets and calendars. If releases were taken lightly and rescinded, the incentive to settle would dissipate and parties opting for such a course could never be secure from litigation." *Griffin v. Bendick*, 463 A.2d at 1345.

There is no evidence in the record to support a finding that the respondent's release was obtained by any fraud, misrepresentation, over-reaching, or material mistake. Carroll was paid $20,000 in exchange for the release of his rights to affect title in Bonniecrest. Additionally, he had experience with real estate development projects, having acted as an advisor and consultant for three other projects that previously were undertaken by Marchetti and Joseph. Finally, Carroll was represented by an attorney at the meeting at which he executed his release. In this context, the clear and unambiguous terms of the release must be enforced. Carroll had no right to obtain an attachment order because he had contractually waived all remedies that he may have previously possessed to affect title in Bonniecrest. The trial justice's failure to recognize this fact when awarding the respondent the disputed attachment was therefore error.

The petition for certiorari is granted, the attachment order appealed from is quashed, and the case is remanded to the

essential and most significant ingredient of any financing of real estate acquisition and development." Hershman, *Permanent Financing*, 1 Modern Real Estate Transactions, 455–56 (4th ed.1983).

Superior Court with our decision endorsed thereon.