DECISION
Before this Court is Defendants' Chace Drydock, LLC ("Chace Drydock"), Southeastern New England Shipbuilding Corporation ("SENESCO"), Malcolm G. Chace ("Chace"), Thomas E. Gardner ("Gardner"), and Frederick G. Frost III ("Frost"), who will be collectively referred to as the "Chace Defendants," Partial Motion to Dismiss pursuant to Super. R. Civ. P. Rule 12(b)(6). The Chace Defendants ask this Court to Dismiss Counts II and IV of the Complaint brought by Plaintiffs USCS ATB, LLC, U.S. Shipping Partners, L.P., and USS Vessel Management, LLC ("Plaintiffs") asserting that the complaint, as it pertains to these counts, fails to state a claim upon which relief may be granted. The Plaintiffs allege in Count II of their complaint that the Chace Defendants fraudulently induced them to enter into a series of agreements in May of 2006, and that an unspecified amount of damages were suffered as a result. Count IV of the complaint alleges a personal indemnity by Defendant Chace *Page 2 
under which the Plaintiffs ask this Court to extend to them the rights of indemnity of certain of the other Defendants.
 Facts and Travel
This dispute arises out of an Articulated Tug Barge ("ATB") Agreement entered into between USCS ATB and SENESCO on or about August 7, 2004. (Comp. ¶ 13.) The ATB Agreement called for the construction and launch of the entire ATB[1] at the SENESCO facility located in Rhode Island. (Comp. ¶¶ 13-14.) The launch facility includes the drydock owned by Defendant Chace Drydock. After construction had commenced, SENESCO disclosed that its Rhode Island facility would not have the capacity to complete construction and launch the Barge. (Comp. ¶ 15.) As a result, on or about November 8, 2005, an amendment to the ATB Agreement was entered into between the parties. (Comp. ¶ 16.) Pursuant to this amendment, "at the expense of USCS ATB, the Barge would be transported to a then non-functioning shipyard facility in Sparrows Point, Maryland (the `Sparrows Point Facility')." (Comp. ¶ 16.) The amendment also specified that the Tug would remain at the Rhode Island facility for completion, as well as its launch. (Id.)
In the months following the amendment, Plaintiffs claim that SENESCO "secretly divert[ed] USCS ATB milestone payments — paid by USCS ATB for the explicit purpose of paying subcontractors working on the Tug and the Barge — to meet general overhead and/or to pay subcontractors working at the SENESCO Facility on unrelated projects. . . ." (Comp. ¶ 18.) USCS, however, asserts that financial realities left USCS with no choice but to continue its relationship with the Chace Defendants to ensure completion of *Page 3 
construction on the ATB. (Comp. ¶ 19.) In May 2006, the parties entered into what became known as the "May 2006 Agreements", which most notably put the risks and costs for completion of the ATB on USCS ATB and provided for USCS ATB to be paid $21 million. (Comp. ¶¶ 19, 21) The May 2006 Agreements consisted of a series of related agreements to make the necessary changes to the original construction and launch plan for the Barge, as well as the Tug. (Comp. ¶¶ 19-20.) The Agreements included:
 1. An "Implementing Agreement" entered into between the Plaintiffs and Defendants SENESCO, Chace, and Chace Drydock. (Comp. ¶ 21.) The Implementing Agreement most significantly provided for: (1) the termination of the ATB Agreement; (2) transfer of ownership of the ATB to USCS ATB; and (3) responsibility for completion of construction and launch to shift to the Plaintiffs. (Comp. ¶ 21.)
 2. A "Site Agreement" acknowledging the necessity of the Chace Drydock to launch the Tug. (Comp. ¶ 22.) The Site Agreement also granted the Plaintiffs access to the SENESCO Facility primarily for the purpose of construction and launching the Tug. (Id.) Finally, the Site Agreement required the Defendants to provide SENESCO with a Tug Launching Protocol detailing how the Tug would be launched utilizing the Drydock. (Id.)
 3. A "Consulting Agreement" between USCS ATB and SENESCO obligating SENESCO "to provide USCS ATB with `administrative, operations, and planning services' . . . in connection with, inter alia, the launching of the Tug." (Comp. ¶ 23.) *Page 4 
 4. Finally, "Mutual General Release and Agreements" ("Releases") were entered into between the Plaintiffs, SENECSO, Chace, and Chace Drydock. (Comp. ¶ 24.) The Plaintiffs point out in their complaint, however, that the Releases specifically "carved out" and excluded claims by the US Shipping Companies `arising under the [May 2006 Agreements] with respect to undertakings, representations or warranties. . . ." (Id.)
The complaint makes clear that at the heart of the May 2006 agreements was the capacity of the Drydock to launch the Tug and the representations by the Chace Defendants that this capacity existed at the Rhode Island Facility. (Comp. ¶¶ 25-26.)
Following the May 2006 Agreements, the Chace Defendants continued to represent that the Drydock could accommodate the Tug launch. (Comp. ¶ 27.) Despite these representations, however, the Plaintiffs were not provided with the Tug Launching Protocol, which likely would have brought to light the fact that the Drydock was "structurally incapable of launching the Tug." (Comp. ¶¶ 22, 28; see also Site Agreement, Comp. Ex. B. at 1.3.) Plaintiffs thereafter engaged the assistance of Mammoet USA NE, Corp. ("Mammoet"), a third party consultant group brought on to assist in developing a launch proposal. (Comp. ¶¶ 29-30.) Mammoet did provide a launch proposal, which was provided to SENESCO and Chace Drydock, neither of whom objected to the proposal. (Comp. ¶ 30.)
Necessary for final planning were the specifications for structural integrity, carrying capacity, and various engineering details surrounding the Drydock which were requested from SENESCO and Chace Drydock by Mammoet and USCS ATB. (Comp. ¶ 31.) Although both the Site Agreement and the Consulting Agreement required them to *Page 5 
do so, the Chace Defendants failed to make this information available. (Comp. ¶ 32.) As a result, USCS ATB engaged engineers and naval architects to inspect the structural integrity of the Drydock, who reported in October of 2006 that it was incapable of supporting the Tug. (Comp. ¶¶ 33-34.) Ultimately, USCS ATB moved the Tug onto a barge for transport to an alternative launch facility. (Comp. ¶ 37.)
The Chace Defendants now move this Court, pursuant to Super. R. Civ. P. Rule 12(b)(6), to dismiss Counts II (fraud) and IV (indemnity) of the Complaint.
 Standard of Review
It is well-settled in Rhode Island that the role of a Rule 12(b)(6) motion is merely to test the sufficiency of the complaint. See TosteFarm Corp. v. Hadbury, Inc., 798 A.2d 901, 905 (R.I. 2002) quotingR.I. Employment Sec. Alliance, Local 401, S.E.I.U., AFL-CIO v. StateDep't of Employment and Training, 788 A.2d 465, 467 (R.I. 2002);see also Pellegrino v. R.I. Ethics Comm'n, 788 A.2d 1119, 1123 (R.I. 2002) (stating that "[t]he standard for granting a motion to dismiss is a difficult one for the movant to meet."). Accordingly, the Court must ascertain whether, if the allegations of the complaint are true, the Plaintiffs would be entitled to the requested relief, resolving any factual doubts in favor of the Plaintiffs at this stage. Bruno v.Criterion Holdings, Inc., 736 A.2d 99 (R.I. 1999). The complaint must give fair and adequate notice of the plaintiff's claim, but in most cases it need not contain a high degree of factual specificity.See, e.g., Hyatt v. Village House Convalescent Home, Inc., 880 A.2d 821,824 (R.I. 2005) (per curiam). Therefore, for the Chace Defendants to prevail on their Motion, it must be clear "beyond a reasonable doubt" that the Plaintiffs would not be entitled to relief under any set of facts *Page 6 
which might be proved in support of its claim as articulated in the complaint. See id. quoting Bragg v. Warwick Shoppers World, Inc.,227 A.2d 582, 584 (R.I. 1967).
 Analysis
A. Fraud
As mentioned above, Rhode Island rules generally allow for liberal pleading standards to be entertained in our courts. Specifically, Super. Ct. R. Civ. P. 8(a) states that a complaint "shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief the pleader seeks." It is well-settled in this State that the pleader need not allege "the ultimate facts that must be proven in order to succeed on the complaint." See Haley v. Town of Lincoln, 611 A.2d 845, 848 (R.I. 1992). Rather, a pleading need only provide its opponent with "fair and adequate notice of the type of claim being asserted." See id.
A claim for fraud, however, is subject to the greater pleading standards set forth in Super. Ct. R. Civ. P. Rule 9(b) requiring that the circumstances constituting fraud or mistake be stated with particularity. See Robert B. Kent et al., Rhode Island Civil andAppellate Procedure, § 9:2 (2006). Of course, what constitutes particularity depends upon the nature of the case involved and should be "determined in the light of the purpose of the rule to give fair notice to the adverse party and to enable him to prepare his responsive pleading." Id.; see also Grant v. Wilcox, 145 A. 306 (R.I. 1929). While providing fair notice to the adversary remains the basic standard, the serious nature of an assertion of fraud justifies this heightened pleading standard. See Women's Dev. Corp. v. City of Cent. Falls, 764 A. 2d 151, 161-62 (R.I. 2001). *Page 7 
To establish a common law claim of fraud, "the plaintiff must prove that the defendant `made a false representation intending thereby to induce plaintiff to rely thereon' and that the plaintiff `justifiably relied thereon' to his or her damage." Bitting v. Gray, 897 A.2d 25, 34
(R.I. 2006) citing Bogosian v. Bederman, 823 A.2d 1117, 1120 (R.I. 2003) quoting Stebbins v. Wells, 766 A.2d 369, 372 (R.I. 2001).
1. False Representation
Plaintiffs allege fraud based upon the representations made to them leading up to and memorialized in the May 2006 Agreements. Specifically, the Plaintiffs allege that the Chace Defendants all "had actual knowledge of the Drydock's inability to launch the Tug, and falsely represented the contrary to USCS ATB in order to fraudulently induce it into entering into the May 2006 Agreements." (Comp. ¶ 52.) The complaint further specifies each defendant's individual motives for this representation: (1) Frost served as acting CEO of SENESCO at the time funds were allegedly diverted away from the construction/launch project; (2) Gardner was a primary representative of SENESCO; (3) both Chace and Frost were SENESCO Directors who approved the May 2006 Agreements; and (4) Chace insisted on a personal general release from the US Shipping Partners from any personal liability. (Id.) Plaintiffs assert that the representations by the Chace Defendants that the Drydock would be capable of launching the Tug were reasonably relied upon to their detriment and motivated their decision to sign the May 2006 Agreements. (Comp. ¶ 53.)
Plaintiffs suggest that they have pled fraud with the requisite particularity including time, place, and contents of the false representations. As the complaint alleges, the Implementing Agreement and the Site Agreement each represent the capabilities of *Page 8 
the Drydock to safely launch the Tug. (Comp. ¶ 21.) Specifically, the Implementing Agreement stated that "[t]he parties were simultaneously entering into [the May 2006 Agreements], the purposes of which,inter alia, were to enable the US Shipping Partners to complete, launch, and commission the Tug from the SENESCO Facility, with SENESCO's and Chace Drydock's assistance, pursuant to a `Tug Launching Protocol' to be provided by SENESCO." (Comp. ¶ 21.) Similarly, the Site Agreement makes clear the necessary role of the Drydock for the Tug Launch. It stated at section 1.3 that:
 [t]he parties agree that upon completion of construction of the Tug, the Tug shall be launched from the Quonset Point facility pursuant to a Tug launching protocol (the "Tug Launching Protocol" in the form to be attached hereto as Exhibit "B" and incorporated herein and to be provided by SENESCO no later than June 7, 2006 and agreed to by the Parties), and shall provide among other things, access to the space, utilities, shipyard facilities, pier and drydock required to successfully complete such launch in accordance with the Tug Launching Protocol.
(Comp. Ex. B, Site Agreement (emphasis added).) In fact, the Plaintiffs' Complaint directs this Court to the numerous Agreements entered into in May of 2006, all of which were predicated on the ability of the Drydock to accommodate the safe launch of the Tug.
Despite reference to the specific Agreements in which the alleged false representations were made, Defendants motion primarily asserts that Plaintiffs have failed to plead with the requisite particularity. Essentially the Chace Defendants argue that Plaintiffs fail to "recite or identify a specific misrepresentation or false statement made by a specific defendant, or to identify the place and contents of any such statement." (Defendant's Memo. at 9.) Moreover, Defendants point out Plaintiffs' use of pre-release facts in an effort to establish their claim for fraud. (Id. at 11.) However, as detailed below, Plaintiffs' Complaint specifies that the alleged fraud is found in the *Page 9 
documents referred to as the May 2006 Agreements, not prior negotiations. More specifically, the representations in the Implementing and Site Agreements as quoted above. (Comp. ¶ 11.)
The Plaintiffs allege that the above representations were false because a subsequent determination by USCS engineers showed that the Drydock lacked the structural integrity to safely launch the Tug upon necessary pre-launch inspection. (Comp. ¶ 34.) Such representations, the Plaintiffs assert, should be considered "a manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts." Nisenzon v.Sadowski, 689 A.2d 1037, 1046, n. 11 (R.I. 1997) (defining a false representation as it pertains to a claim of fraud). At the very least, Plaintiffs ask this Court to find that the statements made in the May 2006 Agreements were "materially misleading" because such statements may serve as the basis of a valid claim for fraud. See Plaintiff's Memo. inOpp. to Partial Mtn. to Dismiss citing Rest. (Second) Torts § 529 (1977) ("A representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation").
Finally, the Plaintiffs allege in their complaint that the Chace Defendants had knowledge of the falsity of their statements when they were made to induce the Plaintiffs to enter into the May 2006 Agreements. (See Comp. ¶¶ 28, 52.)
2. Detrimental Reliance
The Complaint further alleges the detrimental and reasonable reliance of USCS on the representations by the Chace Defendants. The Complaint states that: *Page 10 
 USCS ATB reasonably relied to its detriment upon SENESCO's, Chace Drydock's, Chace's, Gardner's and Frost's intentionally false representations that the Drydock was capable of safely launching the Tug. . . . USCS ATB has been damaged by the above referenced fraud in an amount to be determined at trial, and is entitled to recover such damages from SENESCO, Chace Drydock, Chace, Gardner, and Frost.
(Comp. ¶¶ 53-54.) While the Chace Defendants assert that the Plaintiffs failed to avail themselves of the opportunity to have their own engineers inspect the integrity of the Drydock, the Complaint and accompanying exhibits make clear that this burden was not the Plaintiffs' to bear. In fact, our Supreme Court has held that a Plaintiff need not have investigated the accuracy of a representation in order to bring a subsequent action for fraud. See Travers v.Spidell, 682 A.2d 471, 474 (R.I. 1996) (plaintiff justifiably relied on defendant's representation as to location of a water well and is not expected to investigate accuracy of such representation prior to transacting business); see also Hunt v. Barker, 46 A. 46, 46 (R.I. 1900) (a plaintiff induced to enter contract to install a heating system in home represented by defendant to be his own, could maintain an action for deceit even though the land's true ownership status might have been ascertained by an examination of the title records).
3. Release
The Chace Defendants ask this Court to enforce the Release provisions found in the May 2006 Agreements, and find that they preclude the action for fraudulent inducement brought by Plaintiffs. However, as Plaintiffs point out, the Releases do not apply to claims "arising under the Settlement Agreements and the Operative Documents with respect to undertakings, representations, or warranties [found therein]." (Comp. Ex. D ¶ 2.) Among the Settlement Agreements and Operative Documents specifically *Page 11 
excluded from the release are the Implementing Agreement, the Site Agreement, and the Consulting Agreement. (See id.) The claim of fraud brought by plaintiffs here specifically arises out of these documents as spelled out in greater detail above. The false representations are found in the Implementing and Site Agreements and therefore are not subject to the terms of the release. It is evident to this Court that the representations to which they point were the consideration provided by the Chace Defendants for the grant of the release by Plaintiffs.
The law concerning this issue is well settled in this state. The validity of a release is determined in light of three factors: "(1) the existence of consideration for the release, (2) the experience of the person executing the release, and (3) the question of whether the person executing the release was represented by counsel." Guglielmi v. RhodeIsland Hosp. Trust Fin. Corp., 573 A.2d 687, 690 (R.I. 1990). Based on the answers to these questions, "the court will find a release to be valid and binding unless it has been procured through fraud, misrepresentation, overreaching, or a material mistake on the part of either party." Id. citing Bonniecrest Dev. Co. v. Carroll, 478 A.2d 555,559 (R.I. 1984).
A release induced by fraudulent representations is invalid and will not be upheld under the laws of this state. See Smith v. Rhode IslandCo., 39 R.I. 146 (1916) (stating that to "justify holding [a] release invalid on account of fraud, [plaintiff] must have believed the misrepresentation, and it must have been the inducing cause for her action"). In fact, our Supreme Court has stated that "fraud vitiates all contracts." LaFazia v. Howe, 575 A.2d 182, 185 (R.I. 1990). "A person who has been induced by fraud to enter into a contract may pursue either one of two remedies: rescind the contract or affirm the *Page 12 
contract and sue for an action for deceit." Cardoso v. Mendes, 1998 R.I. Super. LEXIS 15 (June 9, 1998) citing Lafazia, 575 A.2d at 184.
Because the Plaintiffs in stating their claims, pleaded all of the essential elements of fraud with particularity to the satisfaction of Rule 9(b) to create a question of fact upon which a jury would be called on to pass, this Court denies the Defendants Motion to Dismiss Count II of the Complaint.
B. Fraud against Defendants Frost and Gardner in their IndividualCapacities
In their Motion to Dismiss, the Chace Defendants also ask this Court to find that Plaintiffs cannot state a claim for fraud against Defendants Frost and Gardner in their individual capacities because they were acting merely as agents of the disclosed principals, who are defendants to this action. The Defendants argue that without seeking to pierce the corporate veil, Plaintiffs cannot seek recovery from Frost and Gardner in their individual capacities and may only seek such recovery from their principals.
The resolution of this issue rests on the legal standard applicable to Frost's and Gardner's status as agents for the other named defendants. It has long been settled in Rhode Island that "an agent acting on behalf of a disclosed principal is not personally liable to a third party for acts performed within the scope of his authority." Kennett v.Marquis, 798 A.2d 416, 419 (R.I. 2002) citing Cardente v. MaggiacomoIns. Agency, Inc., 272 A.2d 155, 156 (R.I. 1971); see also Kennedy v.Ayala, 717 A.2d 648, 649 (R.I. 1998). Exceptions to this protection, however, do exist. Specifically, an agent may be held personally liable for unauthorized acts outside the scope of the agency, for acts to which the agent has bound himself or herself — either expressly or impliedly — under a contract, or for acts within the scope of a duty that is otherwise independent of the agency *Page 13 
relationship. Kennett, 798 A.2d at 419 citing Kenney Mfg. Co. v.Starkweather Shepley, Inc., 643 A.2d 203, 209 (R.I. 1994); C.C. PlumbMixes, Inc. v. Stone, 272 A.2d 152, 154 (R.I. 1971); Forte Brothers,Inc. v. Nat'l Amusements, Inc., 525 A.2d 1301, 1303 (R.I. 1987). Finally, agents may be held personally liable when false information is delivered knowingly or intentionally. See Stebbins v. Wells,818 A.2d 711, 719 (R.I. 2003).
The Plaintiffs have not and do not assert that Frost and Gardner acted outside the scope of their agency relationship. Frost was SENSESCO's signatory on the May 2006 Agreements and Gardner served SENESCO as its primary representative in dealings with the U.S. Shipping Parties. (Comp. ¶ 52.) Rather, Plaintiffs ask this Court to find that as agents, Frost and Gardenr may not escape liability "for tortuous acts [committed] even though they are committed in the course of performing [their] duties." See Plaintiff's Memo. in Obj. to Defendant's PartialMtn. to Dismiss at 25 citing SSJ Enters., LLC v. ICOA, Inc.,2006 WL 319285, at *2 (D.R.I. Feb. 19, 2006). Plaintiffs set out in their complaint specific allegations against Frost and Gardner that Plaintiffs allege constitute fraud. The complaint alleges that:
 [o]n information and belief, Garnder instructed and directed, on behalf of Chace, the officers and directors of SENESCO and Chace Drydock in the management and operation of the business of SENESCO and Chace Drydock. On information and belief, Gardner issued instructions under which the agreements and acts underlying th[e] complaint were made, including, but not limited to, intentionally making false statements and withholding material information for purposes of fraudulently inducing Plaintiffs into entering into the [May 2006 Agreements]. (Comp. ¶ 7.)
 Directed by co-defendants Chace and Gardner, Frost negotiated the agreements underlying th[e] Complaint and *Page 14 
intentionally made false statements for the purpose of fraudulently inducing Plaintiffs into entering into the [May 2006 Agreements]. On information and belief, Frost issued instructions under which the agreements and acts underlying th[e] Complaint were made, including, but not limited to, intentionally making false statements and withholding material information for purposes of fraudulently inducing Plaintiffs into entering into the [May 2006 Agreements]. (Comp. ¶ 8.)
Finally, the Court notes that Frost was a signatory to the May 2006 Agreements in his capacity as acting CEO of SENESCO and may be held liable for supplying false information to induce another to enter a business transaction. See Estate of Braswell v. People's CreditUnion, 602 A.2d 510, 512 (R.I. 1992) citing Rest. (Second) Torts, § 552(1).
Taking the Plaintiffs' allegations in the Complaint as true, as this Court must when deciding a Motion to Dismiss, the Court hereby denies Defendant Frost and Defendant Gardner's Motion to Dismiss the claim for fraud against them in their individual capacities.
C. Indemnity
The Chace Defendants also seek the dismissal of Count IV, indemnity against Chace, in their Partial Motion to this Court. Specifically, the Plaintiffs claim that "as part of the transaction that resulted in Reinauer Transportation's acquisition of the SENESCO Facility and Reinauer Drydock's acquisition of control over the Drydock, [Chace] personally indemnified SENESCO, Chace Drydock, and the Reinauer Defendants from any claim arising from SENESCO's operation of the SENESCO Facility and Chace Drydock's operation of the Drydock at the facility." (Comp. ¶ 11.) Chace does not suggest that the indemnity agreement does not exist, rather he disputes that Plaintiffs are *Page 15 
intended as third-party beneficiaries to the agreement. "When one party for valuable consideration, engages another by contract to do some act for the benefit of a third party, the latter who would enjoy the benefits, may maintain an action for breach of contract." Davis v. N.E.Pest Control Co., 576 A.2d 1240, 1242 (R.I. 1990) citing Rae v. AirSpeed, Inc., 435 N.E.2d 628, 632-33 (Mass. 1982). "If the third party is an intended beneficiary, the law implies privity of contract."Id. citing Calder v. Richardson, 11 F. Supp. 948, 949-50 (S.D. Fla. 1935), aff'd, 118 F.2d 249 (5th Cir. 1941).
Here, Plaintiffs allege that Chace personally indemnified SENESCO, Chace Drydock, and the Reinauer Defendants for any and all liability that may arise from a suit brought against them by Plaintiffs. (See Comp. ¶ 11.) The indemnity agreements were negotiated and executed in November of 2006, nearly six months after the May 2006 Agreements were executed. (Comp. ¶ 9.) Chace, therefore, had knowledge of the prior agreements and liabilities to the Plaintiffs and it should come as no surprise that Plaintiffs would seek recovery from the source of that indemnification.
Chace's primary assertion is that Plaintiffs lack standing to bring a claim for indemnity of this nature against Chace. Namely, Chace asks this Court to find that because the Plaintiffs were not named in the indemnity agreement, they cannot state a claim for recovery under that contract. Plaintiffs assert in their Memorandum, however, that "indemnity agreements by their very nature serve to benefit a plaintiff suing the indemnified party." (Plaintiffs' Memo. in Obj. to Defendant'sPartial Mtn. to Dismiss, at 27.) Also, the Chace Defendants were aware of the assertions of breach of the May 2006 Agreements by Plaintiffs well in advance of executing the indemnification contract with SENESCO. (See id.) *Page 16 
Section 302 of the Restatement (Second) of Contracts, which has been adopted in this jurisdiction, defines an incidental beneficiary as a "beneficiary who is not an intended beneficiary." Rest. 2dContracts § 302 (2). The Restatement provides the following illustration to distinguish between an intended beneficiary and an incidental beneficiary:
 B promises A to pay whatever debts A may incur in a certain undertaking. A incurs in the undertaking debts to C, D and E. If the promise is interpreted as a promise that B will pay C, D and E, they are intended beneficiaries under Subsection (1)(a); if the money is to be paid to A in order that he may be provided with money to pay C, D and E, they are at most incidental beneficiaries.
Id. Therefore, "unless the performance required under the particular contract will directly benefit the would-be intended beneficiary, he is at best an incidental beneficiary." Public Svc. Co. of N.H. v. HudsonLight and Power Dep't and Peabody Municipal Light Plant, 938 F.2d 338,342 (1st Cir. Ct. App. 1991) internal citations omitted. Essentially, the Restatement test requires that the "parties directly and unequivocally intend to benefit a third party in order for that third party to be considered an intended beneficiary." See State of RhodeIsland Dep't of Corrections et al. v. ADP Marshall, Inc., 2004 R.I. Super. LEXIS 66, *25 (Mar. 29, 2004) quoting Forcier v. Cardello,173 B.R. 973, 985 (D.R.I. 1994). The Forcier Court went on to state that "a promissor's mere awareness that someone other than the promise may derive a benefit from the promisor's performance under the contract is insufficient to cloak that third party with the mantle of intended beneficiary." Forcier, 173 B.R. at 986.
This Court finds that Plaintiffs have failed to establish themselves as third party beneficiaries under the indemnity agreement entered into by Defendant Chace. While *Page 17 
this Court has not been provided a copy of the indemnification agreement, neither party claims that Plaintiffs were named beneficiaries under the terms of the contract. Plaintiffs merely assert that because potential liability to the plaintiffs existed at the time the indemnification agreement was created, their indemnification claim should come as no surprise to Chace. (See Comp. ¶¶ 11, 60.) An indemnitor's mere awareness, as stated above, however, is insufficient to establish third-party beneficiary status. See Forcier,173 B.R. at 986.
The Court here finds that Plaintiffs' rights under the indemnification agreement, if any, are those of a mere incidental beneficiary. As such, Plaintiffs are not able to bring a direct action against Chace as indemnitor. See Rest. 2d Contracts § 302 citing Hurley v. Lano Int'l,Inc., 569 S.W.2d 602, 603 (1978). Plaintiffs here were incidental beneficiaries of the indemnity agreement in that the contracting parties (the Chace Defendants) did not intend Chace to pay plaintiffs directly, but rather intended that Chace Drydock, SENESCO, and the Reinauer Defendants would pay Plaintiffs and in turn be reimbursed under the indemnification agreement by Chace. Therefore, Plaintiffs cannot maintain a direct cause of action against Chace under the indemnity agreement.
The Court will, therefore, grant Defendant Chace's Motion to Dismiss Count IV of the Plaintiffs' Complaint.
 CONCLUSION
Accepting the allegations in Plaintiffs' complaint as true and viewing those allegations in the light most favorable to them, the Court here denies the Chace Defendants' Partial Motion to Dismiss Count II based on the allegations in the complaint, because the Plaintiffs have stated a claim for which they will be permitted to prove facts *Page 18 
entitling them to relief. Additionally, the Court hereby grants Defendant Chace's Motion to Dismiss Count IV, the claim for indemnity against Chace. Counsel may present an agreed upon Order consistent with the Decision rendered herein or competing Orders if one cannot be agreed upon.
[1] The ATB referenced in this decision includes both the "Barge" (Hull No. 46) and the accompanying "Tug" (Hull No. 318). (Comp. ¶ 13.) *Page 1